UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FDIC AS RECEIVER FOR SEAWAY BANK AND TRUST COMPANY, | |
| Plaintiff, | Case No. 17-cv-01517 |
| v. | Judge John Robert Blakey |
| URBAN PARTNERSHIP BANK, | |
| Defendant. | |
| URBAN PARTNERSHIP BANK, | |
| Third-Party Plaintiff, | |
| v. | |
| FIRST FINANCIAL NETWORK, INC., | |
| Third-Party Defendant. | |

## MEMORANDUM OPINION AND ORDER

Third-Party Plaintiff Urban Partnership Bank (Urban) sued Third-Party Defendant First Financial Network, Inc. (FFN) for breach of contract and failure to indemnify. [36]. Urban alleges that FFN breached its contract to manage the online auction of distressed loans, resulting in the underlying suit by the Federal Deposit Insurance Corporation (FDIC) when the sale of those loans fell through. *Id*. FFN moves to dismiss Urban's third-party complaint on the grounds that Urban cannot show damages and is not entitled to indemnification. [41]. For the reasons explained below, this Court partially grants and partially denies FFN's motion.

1

I.   Background

   A.   Materials

This Court draws facts from the amended complaint, [36], and the exhibits attached to it, *see Thompson v. Ill. Dep't of Prof'l Reg.*, 300 F.3d 750, 753 (7th Cir. 2002). Here, this Court may also consider the exhibit attached to FFN's motion to dismiss, [65], without converting the motion to one for summary judgment, as discussed below. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

   B.   Factual Allegations

Urban formed in August 2010 to purchase certain assets of a failed bank from the FDIC. [36] ¶ 5. These assets included a number of "non-performing or otherwise distressed" loans that Urban bought while entering a "loss share" agreement with the FDIC, which would shoulder certain losses arising from these loans. *Id*. ¶¶ 5, 6. When a number of the loans continued experiencing losses, Urban decided to sell off a portfolio of some of the loans. *Id*. ¶ 7. Urban hired FFN as a financial advisor to manage the sale of the portfolio because of FFN's "history and experience" selling loans and assets and its familiarity with FDIC policies, since the FDIC had to approve the sale. *Id*. ¶¶ 7–9.

In the summer of 2015, Urban and FFN developed a proposal for the FDIC on the planned sale of the loan portfolio. *Id*. ¶ 10. FFN drafted the proposal, which detailed FFN's relevant experience and the proposed sale process. *Id*. ¶¶ 11–14. The FDIC approved the sale in September 2015. *Id*. ¶ 15–16. In October, Urban and FFN entered a Loan Sale Engagement Agreement (LSEA), which made FFN Urban's exclusive advisor in the sale, granted FFN the exclusive right to market

and sell the portfolio for a specified period, and committed FFN to various tasks relating to the sale, including managing the online auction for the portfolio. *Id.* ¶¶ 17–19. FFN's alleged breach of the LSEA forms the basis of Urban's third-party complaint.

The LSEA required FFN to prepare various legal documents for the auction, including the loan sale agreement (LSA), and additional terms and conditions of sale. *Id.* ¶ 19. FFN also had to analyze all the bids received for the portfolio using its proprietary Bid Optimization Model and provide "bid day reports" to UPB. *Id.* The bid analysis was to include a detailed assessment of "all phases of the sale." *Id.* ¶¶ 13, 26.

Beginning October 14, 2015, interested buyers previously vetted and approved by FFN could visit FFN's website and access information about the portfolio, including the terms and conditions of sale. *Id.* ¶¶ 20–22. On October 15, FFN told Urban that it wanted to amend the terms and conditions of sale by adding a requirement that bidders submit a servicing plan explaining "how loan payments will be collected and administered after the servicing transfer date" if the bidder won. *Id.* ¶ 23. Urban accepted the recommendation; on October 22, FFN posted the updated terms and conditions online and notified eligible bidders of the change. *Id.* ¶¶ 27–29. Under the terms and conditions, bidders had to submit both the servicing plans and the actual bids to FFN. *Id.* ¶¶ 23, 30. The terms and conditions also provided that the terms of sale—set out in the loan sale agreement (LSA)— were non-negotiable. *Id.* ¶ 32.

FFN drafted the LSA and posted it online on October 30. *Id*. ¶¶ 33–34. The LSA contained several provisions relating to the "servicing transfer date," meaning the date when the responsibilities for servicing the loans would transfer from Urban to the purchaser. *Id*. ¶¶ 31, 36–37. The LSA distinguished between loans governed by the Real Estate Settlement Procedures Act (RESPA), and those not subject to RESPA. *Id*. ¶¶ 37–39. The servicing transfer date for non-RESPA loans was the date of the sale's closing, December 11, 2015. *Id*. ¶ 38. Urban's servicing of RESPA loans was also to cease on the closing date, except as required by law. *Id*. ¶ 39. Reading the LSA and RESPA together, this meant that Urban would transfer all servicing to the buyer on December 26 (i.e., 15 days after the closing). *Id*. ¶¶ 39–40. At one point Urban asked FFN if the LSA was clear enough for bidders to ascertain the servicing transfer date; FFN's counsel recommended leaving the provisions as they stood, and Urban acquiesced. *Id*. ¶¶ 42–44.

The deadline for bids was November 17, 2015. *Id*. ¶ 45. Seaway Bank and Trust Company (Seaway), an Illinois bank, registered as a bidder on October 16, and at some point before the deadline asked FFN to waive the requirement that Seaway submit a servicing plan with its bid. *Id*. ¶¶ 47–50. FFN declined, but said that Seaway could submit the servicing plan the day after the bid deadline. *Id*. ¶ 51. On November 17, Seaway submitted its bid and an initial deposit of $100,000 to FFN. *Id*. ¶¶ 52–58. It submitted a servicing plan the next day, as agreed with FFN. *Id*. ¶ 59.

4

When the bidding closed, FFN gave Urban its bid analysis of all the offers for the portfolio, based upon which Urban decided to accept Seaway's bid. *Id*. ¶¶ 63–65. The bid analysis did not raise any issue relating to Seaway's servicing plan. *Id*. ¶ 64. FFN notified Seaway of its successful bid and released all other bids. *Id*. ¶¶ 66–67. On November 24, 2015, Seaway wired FFN its final deposit. *Id*. ¶ 68.

On December 4, Seaway told FFN that it could not service the loans until at least 120 days after the December 11 closing date—contrary to the provisions of the LSA. *Id*. ¶¶ 40, 69, 78. Urban alleges that up to this point, FFN had not reviewed or vetted Seaway's servicing plan. *Id*. ¶¶ 70–71. Urban also claims that if it had known about Seaway's purported change to the servicing transfer date, it would not have accepted Seaway's bid. *Id*. ¶ 76.

On the closing date, December 11, Seaway did not pay the balance of the purchase price, as required by the initial terms and conditions and the LSA. *Id*. ¶ 81. FFN and Urban determined that Seaway had defaulted on the sale agreements, which, under the LSA, entitled Urban to keep Seaway's deposits as a remedy. *Id*. ¶¶ 82–84. FFN transferred Seaway's deposits to Urban. *Id*. ¶ 85.

In early 2016, Seaway sued Urban and FFN in Cook County Circuit Court for the return of its deposits. *Id*. ¶ 86; *see also* ¶ 33 (describing exhibits filed in state case in May 2016). Seaway sued based in part upon the theory that Urban could not hold the deposits based upon the LSA, since Urban and Seaway never had a meeting of the minds, and thus no enforceable contract existed. *Id*. Specifically, Seaway alleged that the LSA did not specify a servicing transfer date of December

5

26, 2015, and that its own servicing plan put Urban and FFN on notice that Seaway's agent could not service the loans until at least 120 days after the December 11 closing. *Id.* ¶ 87.

On January 27, 2017, the Illinois Department of Financial and Professional Regulation's Banking Division closed Seaway and appointed the FDIC as Seaway's receiver. *Id.* ¶ 88. On February 27, the FDIC substituted as plaintiff in Seaway's state court action and immediately removed the case here. *Id.* ¶¶ 89–90. On March 1, the FDIC voluntarily dismissed its claims against FFN. *Id.* ¶ 91. On March 10, Urban sent FFN a demand for defense and indemnification, which FFN denied. [65]. Urban filed a third-party complaint against FFN in April, [13], which it amended in July, [36]. FFN moved to dismiss. [41].

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss does not generally reach questions of fact. *See Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 729–30 (7th Cir. 1999); *but see Levenstein*, 164 F.3d at 347 (7th Cir. 1998) (documents attached to a motion to dismiss may be considered under certain circumstances). To survive a motion to dismiss, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), giving the defendant "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355

U.S. 41, 47 (1957)). A complaint must allege "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In evaluating a complaint, this Court draws all reasonable inferences in the plaintiff's favor and accepts all well-pleaded allegations as true. *Id.* The Court need not, however, accept legal conclusions or conclusory allegations. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

## III. Analysis

FFN seeks to dismiss Urban's third-party complaint on the grounds that Urban has not established the damages element of its breach of contract claim (Count I), and is not entitled to be indemnified or defended by FFN (Count II). [41, 43]. This Court addresses each of Urban's claims in turn.

### A. Count I: Breach of Contract

Urban first alleges that FFN breached the LSEA, resulting in damages from the failure of the portfolio auction (Count I). [36] ¶¶ 92–104. The LSEA contains a choice-of-law provision providing that it is governed by Oklahoma law. [36] at 36 (LSEA § 23(b)). This Court upholds contractual choice-of-law clauses where applying the chosen body of law does not contravene any "fundamental Illinois public policy," and where the chosen forum has "some relationship" with "the parties or the transaction at issue." *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 951 (N.D. Ill. 2006) (internal quotation marks omitted). Because this case

presents a relatively simple claim that FFN did not fulfill its contractual obligations, and Illinois and Oklahoma place similar emphasis on giving contract terms their plain meaning, *compare Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 826 (Okla. 2016), *with Dean Mgmt., Inc. v. TBS Const., Inc.*, 790 N.E.2d 934, 939 (Ill. App. Ct. 2003), nothing in the record or relevant law suggests that applying Oklahoma law would offend Illinois public policy, *see Amakua*, 411 F. Supp. 2d at 951. Additionally, given that FFN is an Oklahoma corporation, [36] ¶ 2, the selection of Oklahoma law is not so arbitrary as to justify overturning the freely negotiated choice-of-law clause in the LSEA, *see id*. at 951–52. Accordingly, Oklahoma law governs this dispute.

Under Oklahoma law, a plaintiff alleging a breach of contract must show the "formation of a contract; a breach of that contract; and actual damages suffered from that breach." *Oltman Homes, Inc. v. Mirkes*, 190 P.3d 1182, 1185 (Okla. App. Ct. 2008). Oklahoma courts have also held that "uncertainty as to the amount of damages does not prevent recovery, and where it clearly appears that loss of profits to a business had been suffered, it is proper to let the jury determine what the loss probably was." *Ferrell Const. Co., Inc. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1010 (Okla. 1982) (internal quotation marks omitted). FFN contends that Urban cannot establish actual damages as a result of any alleged breach of contract, and therefore fails to state a claim. [43] at 9–13. It argues first, that Urban cannot show that it has suffered or will suffer damages from any breach of the LSEA, and second, that the LSEA's limitation-of-liability provision forecloses any damages. *Id*.

8

This Court finds that Urban's allegations sufficiently show damages to survive FFN's motion to dismiss. Rule 8 does not require "that a plaintiff plead damages with particularity." *Williams v. Sabin*, 884 F. Supp. 294, 296 (N.D. Ill. 1995); Fed. R. Civ. P. 8(a)(3). Damage theories may be pled generally or in the alternative, and developed through discovery. *Williams*, 884 F. Supp. at 296; Fed. R. Civ. P. 8(a)(3). Additionally, this Court draws all reasonable inferences in the plaintiff's favor on a motion to dismiss, including inferences relating to damages. *See Centerline Equip. Corp. v. Banner Personnel Serv., Inc.*, 545 F. Supp. 2d 768, 779 (N.D. Ill. 2008). Whether Urban has sufficient evidence to support a claim for damages is a question for summary judgment. *See Allen v. Schnuck Mkts., Inc.*, No. 15-cv-0061-MJR-DGW, 2015 WL 5076966, at *3 (S.D. Ill. Aug. 27, 2015) (citing *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)).

Here, Plaintiff alleges that FFN failed to fulfill its obligations under the LSEA, and as a result, the portfolio sale and the sale agreement with Seaway fell through. [36] ¶ 102–04. Should this Court ultimately find that no valid agreement existed between Urban and Seaway, Urban alleges that its attendant loss of Seaway's deposits will cost of "millions of dollars." *Id.* ¶ 104. Additionally, Urban seeks any amount that would compensate Urban "for its actual losses." *Id.* At present, this Court may readily infer that those losses include the lost opportunity to sell the portfolio to another bidder, *see id.* ¶¶ 67, 76–77, and the costs of maintaining responsibility for the distressed loans in the portfolio, including servicing costs, *see id.* ¶¶ 7, 23, 31. Urban sufficiently pleads such damages to put

9

FFN on notice that Urban seeks compensation for the economic losses stemming from the failed portfolio sale. This showing satisfies Rule 8. *See Allen*, 2015 WL 5076966, at *3.

Even if Urban only claimed damages for the loss of Seaway's deposits—which is not the case, as noted above—that loss is not "illusory," as FFN argues. [43] at 13. In Oklahoma, parties claiming breach of contract may generally recover any damages that "would naturally and generally result from the breach according to the usual course of things." *Florafax Int'l Inc. v. GTE Mkt. Res., Inc.*, 933 P.2d 282, 292 (Okla. 1997); *see also* Okla. Stat. tit. 23, § 21. In following this rule, Oklahoma courts expressly embrace the general principle of *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145, that damages for breach of contract are those that flow naturally from the breach, or that fall within the contemplation of the parties. *See Florafax*, 933 P.2d at 292.

*Hadley*'s definition, enshrined in Oklahoma's damages statute, encompasses both direct and consequential damages (a relevant distinction under the LSEA, discussed next); but here, the loss of deposits, whether a direct or consequential damage, certainly flows naturally from FFN's alleged breach. *See id*. FFN's alleged breach of the LSEA caused the failed agreement between Seaway and Urban. If Urban lost the deposits in addition to losing the planned portfolio sale, that loss would likewise be attributable to the breach: FFN's failure to secure a meeting of the minds between Seaway and Urban plausibly breached the LSEA, causing the

10

loss of the deposits. Nor does FFN offer any authority to the contrary. [43] at 11–13; [45] at 2–3.

In short, had FFN fully performed its obligations under the LSEA, Urban and Seaway would have had an enforceable contract; Urban would either have sold the portfolio or been entitled to keep the deposits upon Seaway's default. Allegedly, FFN's breach foreclosed both outcomes, either of which could serve as a measure of Urban's damages. *See Florafax*, 933 P.2d at 292 (loss of expected monetary gain is recoverable); *Sun Ridge Investors, Ltd. v. Parker*, 956 P.2d 876, 878 (Okla. 1998) ("The measure of damages for breach of contract is the amount that would place the aggrieved party in the position he would have occupied had the breach not occurred.").

Finally, FFN argues that Urban fails to plead facts surmounting the LSEA's limitation on FFN's liability. [43] at 13–15. The LSEA excludes claims for lost profits, or "special, incidental, indirect or consequential damages arising out of or in connection with this agreement or the subject matter hereof." [36] at 32 (LSEA § 17). This limitation does not apply to direct damages or damages resulting from gross negligence. *Id*. FFN contends that Urban's damages are entirely consequential (indirect), and that Urban insufficiently pleads gross negligence, making any relief a legal impossibility. [43] at 14–15. This Court disagrees.

First, this Court already found that Urban plausibly alleges direct damages from any breach of the LSEA, including the costs of maintaining the distressed loans in the unsold portfolio. *See* [36] ¶¶ 7, 23, 31. The LSEA does not limit such

11

damages. Second, even if the bulk of Urban's damages are consequential, Urban adequately pleads gross negligence such that any claims for consequential damages remain viable at this stage.

In Oklahoma, gross negligence means the "want of slight care and diligence." Okla. Stat. tit. 25, § 6. "Slight care or diligence" refers to that which "persons of ordinary prudence usually exercise about their own affairs of slight importance." *State ex rel. Okla. Bar Ass'n v. Braswell*, 663 P.2d 1228, 1232 (Okla. 1983); Okla. Stat. tit. 25, § 4.

The parties spend some time in their briefs arguing whether the Oklahoma Supreme Court requires an intentional act to show gross negligence, citing *Fox v. Okla. Mem. Hosp.*, 774 P.2d 459 (Okla. 1989). The court in that case stated:

> The question is whether the negligence of the hospital physicians and staff was either so flagrant, so deliberate, or so reckless that it is removed from the realm of mere negligence. The *intentional failure* to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life, liberty or property of another, may result in such a gross want of care for the rights of others and of the public that the finding of a wilful [sic], wanton, deliberate act is justified.

*Id.* at 461 (emphasis added).

This Court interprets the phrase "intentional failure" as an illustration of the level of negligence necessary to remove a case "from the realm of mere negligence," *id.*, not as a requirement of an intentional act. In context, the Oklahoma Supreme Court evidently sought to identify conduct of such recklessness or deliberate indifference as to distinguish it from mere negligence. *Id.*; *see also NMP Corp. v. Parametric Tech. Corp.*, 958 F. Supp. 1536, 1546 (N.D. Okla. 1997) (Gross

12

negligence is "the same as a negligence claim, differing only as to the degree."). Indeed, *Fox* itself found that the plaintiff presented a plausible claim for gross negligence by claiming that surgeons failed to "adequately inspect his open abdomen" where they accidentally sealed in a six-and-a-half inch clamp. 774 P.2d at 460, 462. The court found such conduct plausibly willful and wanton, while leaving the final resolution of that issue as a question of fact for trial. *Id.* at 462. Failing to properly inspect a surgery patient—much like failing to properly vet an auction bid—may not be "intentional," yet it could suffice to constitute gross negligence. *See id.* Thus, Oklahoma courts examine the magnitude of the negligence rather than require specific actions to be alleged. Other courts applying *Fox* have likewise noted that a number of paths lead to "gross negligence," including recklessness. *See Redd v. Big Dog Holding Co., LLC*, No. Civ-15-263-c, 2016 WL 6956650, at *2 (W.D. Okla. Nov. 28, 2016) (to be grossly negligent, defendant's conduct must be "so flagrant, so deliberate *or* so reckless that it is removed from the realm of mere negligence") (emphasis added) (quoting *Fox*, 774 P.2d at 461).

Here, Plaintiff alleges both that FFN failed to adequately draft the LSA and that FFN failed to even read Seaway's servicing plan before giving Urban the bid analysis. [36] ¶¶ 42–44, 70–74. Because the LSEA obligated FFN to evaluate the bids fully, including all aspects of the sale, its failure to review these documents may constitute gross negligence. *See Braswell*, 663 P.2d at 1228 (under "mere preponderance" standard, lawyer's failure to keep track of case such that statute of limitations on claim expired would constitute gross negligence). Moreover, FFN's

13

degree of negligence presents a question of fact inappropriate for resolution at this stage. *Fox*, 774 P.2d at 462. For now, Urban plausibly alleges gross negligence by FFN, and its claims for consequential relief remain viable. This Court denies FFN's motion to dismiss as to Count I.

B. **Count II: Indemnification**

Count II of Urban's third-party complaint alleges that FFN breached the LSEA by failing to indemnify and defend Urban in the FDIC's suit. [36] ¶¶ 105–08. FFN argues that the LSEA does not require it to indemnify or defend Urban. [43] at 13. The LSEA obligates FFN to "defend, indemnify and hold harmless" Urban in any suits: (i) arising from the "action or inaction" of FFN; (ii) incurred as a result of gross negligence, misconduct, or any breach of contract by FFN; (iii) alleging that any of FFN's work infringed on intellectual property; or (iv) for personal injury or property damage resulting from FFN's "grossly negligent or intentional acts." [36] at 30–31 (LSEA § 16(a)). FFN contends that this suit did not arise from its action or inaction; that Urban does not allege gross negligence; and in the alternative that Urban's demand for indemnification and defense was untimely. [43] at 16, 17. This Court need not address FFN's first two arguments since it finds that Urban's claim for indemnification was untimely.

The LSEA requires the party seeking indemnification to notify the indemnifying party "within ten (10) business days from receipt of notice of such suit or claim which involves indemnification obligations of the other party." [36] at 31 (LSEA § 16(c)(i)). Seaway brought its initial case against Urban and FFN in early 2016. *See, e.g.*, [36] ¶ 33. The FDIC removed the case on February 27, 2017. *Id.* ¶¶

89–90. According to the letter submitted as an exhibit with FFN's motion to dismiss, Urban did not demand indemnification until March 10, 2017, well beyond ten days from the date of either suit. *See* [65].[1] Because FFN attached the demand letter to its motion to dismiss, this Court ordinarily could not consider it without converting the motion into one for summary judgment. *See Levenstein*, 164 F.3d at 347. Here, however, the letter falls within an exception to that rule.

Generally, a court ruling on a motion to dismiss may consider only consider the plaintiff's complaint and any documents attached to it. *See id.* But one "narrow exception" exists. *Id*. Documents attached to a motion to dismiss "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). Courts may consider such documents on a motion to dismiss without converting it to a motion for summary judgment. *Id.*; *see also Levenstein*, 164 F.3d at 347; *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431–32 (7th Cir. 1993). This exception (also followed in other circuits) prevents a plaintiff from escaping dismissal "simply by failing to attach to his complaint a document that proved his claim had no merit." *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). The classic scenario warranting an exception are "cases interpreting, for example, a contract." *Levenstein*, 164 F.3d at 347. Even though the Seventh Circuit has not yet defined its exact scope, the exception clearly does not apply if the

---

[1] Originally, FFN did not properly attach the demand letter to its memorandum supporting its motion to dismiss, *see* [43], but FFN later filed the letter properly, [65]. That delay does not alter this Court's analysis.

exhibit's authenticity is in question, or where discovery would be required to "authenticate or disambiguate" it. *Tierney*, 304 F.3d at 739.

Here, Urban's complaint states that "Urban demanded that FFN indemnify and defend it against" the FDIC's claims, and FFN refused to do so. [36] ¶¶ 107, 108. This allegation clearly refers to the demand letter that FFN now seeks to submit. Further, the letter remains central to Urban's claim: an element of this breach of contract claim is that there was, in fact, a breach. *See Oltman Homes*, 190 P.3d at 1185 (elements of breach of contract); *see also Elward v. Electrolux Home Prod., Inc.*, 264 F. Supp. 3d 877, 886 (N.D. Ill. 2017) (exception warranted where attachments concern "the elements of plaintiff's claim"). The demand letter shows conclusively that Urban's request for indemnification and defense was untimely, and FFN therefore committed no breach in denying it.

Finally, there is no question as to the demand letter's authenticity. Urban concedes its legitimacy, acknowledging in its response brief that it sent FFN the demand letter on March 10, 2017. *See* [44] at 14, 15; *see also Steigmann v. Democratic Party of Ill.*, 406 F. Supp. 975, 986 (N.D. Ill. 2005) ("Plaintiff cannot get a free pass to get beyond a motion to dismiss by simply failing to attach documents (that he effectively concedes are accurate) to the Complaint where the Complaint refers to those documents and those documents are central to his claim.") (citing *Venture Assocs.*, 987 F.2d at 431). Accordingly, this Court may consider the demand letter attached to FFN's motion to dismiss without converting FFN's motion to dismiss to a motion for summary judgment. *See Levenstein*, 164 F.3d at 347.

With the demand letter properly before this Court, Count II must be dismissed. The LSEA clearly states that the parties must demand indemnification "within ten (10) business days from receipt of notice of such suit or claim which involves indemnification obligations of the other party." [36] at 31 (LSEA § 16(c)(i)). Urban offers no authority as to why this Court should consider the FDIC's claim a distinct "suit or claim" from Seaway's original suit, filed back in 2016. Even if the "suit or claim" at issue constituted the FDIC's suit, the FDIC became the plaintiff in the underlying suit against Urban and removed this case to federal court on February 27, 2017. [36] ¶¶ 89–90. Urban untimely demanded indemnification on March 10, more than ten days after February 27.

Rather than contesting the validity of the demand letter, Urban argues that the LSEA's purpose was fulfilled because FFN had notice of the FDIC's claim, having been Urban's co-defendant until March 1, 2017. [44] at 14. But the LSEA's indemnification provision does not include an exception for situations where the indemnifying party is not prejudiced, or is a co-defendant, or is otherwise on notice of the suit. *See* [36] at 30–32. Under the "plain meaning" of the LSEA, *Am. Biomedical Grp.*, 374 P.3d at 826, Urban had to make its demand for indemnification—at a minimum—within ten days of the initiation of the FDIC's suit on February 27. It did not do so, and FFN therefore did not breach the LSEA by refusing to indemnify and defend Urban. This Court grants FFN's motion to dismiss Count II.

## IV. Conclusion

This Court partially grants and partially denies FFN's motion to dismiss, [41]. This Court denies the motion for Count I of Urban's third-party complaint and grants it for Count II.

Dated: January 22, 2018

Entered:

John Robert Blakey
United States District Judge